Bryan **ALAPERET** and Laurie Alaperet, by Karen Alaperet, as guardian ad litem, and Karen Alaperet, Appellants,

v.

Lillian A. **PHELPS**, as personal representative of W. D. Phelps, Deceased, Appellee.

No. 22082.

United States Court of Appeals
Ninth Circuit.

Feb. 26, 1969.

J. Kent Bourland (argued), of Wisti, Jaaskelainen & Schrock, Hancock, Mich., for appellant.

Elwin C. Leavitt (argued), Las Vegas, Nev., for appellee.

Before JOHNSEN*, MERRILL and ELY, Circuit Judges.

JOHNSEN, Circuit Judge.

The action involved is one in diversity jurisdiction for damages from wrongful death under Nevada law, brought by the widow and the guardian ad litem of the minor children of Douglas Alaperet, deceased, against W. D. Phelps, the general contractor on a well-construction project. The District Court dismissed the action on summary judgment, and we affirm.[1]

It seems clear to us that the District Court properly held that, under the Nevada Industrial Insurance Act (workmen's compensation law), Chapter 616, Nevada Revised Statutes (herein N.R.S.), Alaperet, who was an employee of General Machine Shop, had the status of a "statutory employee" of Phelps as to the work which he was doing on the construction project, and that Phelps therefore could not be subjected to a third party action in damages for Ala-

---

* Harvey M. Johnsen, Senior Circuit Judge of the Eighth Circuit, sitting by designation.

1. Phelps has died during the pendency of the appeal and his personal representative has been substituted as appellee herein.

peret's death. Both Phelps and General Machine were within the coverage of the Nevada workmen's compensation law as to their operations, and the death benefits thereunder had been duly paid on account of Alaperet's death as an employee of General Machine.

Phelps had contracted to drill and complete a 1,000-foot well for the Las Vegas Valley Water District at a price of $28,070. Some 20-inch steel casing was to be used in the well, the sections of which were required by the contract to be "joined with continuous welds". It was further provided that Phelps should immediately correct any defects in work or materials of the project. The initial welding was done by one of Phelps' employees while the end of a section was still a short distance above the ground. During the course of the operations it was discovered that a fracture or separation had occurred in the welding between two sections, which had been sunk about 24 feet into the well hole.

The only way that this condition could be corrected was to reweld the sections from inside the sunken casing. Phelps' welder apparently did not feel competent or preferred not to tackle this inside task. Phelps thereupon made an agreement with General Machine Shop to do the rewelding job. Welding was one of General Machine's regular activities. It sent Alaperet to do the task. He was lowered into the casing by some of Phelps' employees, taking along a hand welder and an oxygen hose. While he was working at the task, his oxygen apparently caught fire and he received burns from which he died. General Machine billed and was paid by Phelps the sum of $20.00 for the work done.

■ Under the Nevada Industrial Insurance Act, the rights, liabilities, and remedies provided for therein are "exclusive and conclusive on both the employer and employee" as to all injuries occurring to an employee arising out of and in the course of his employment. Tab Construction Co. v. Eighth Judicial District Court, Nev., 432 P.2d 90, 91; N.R.S. 616.370. For purposes of rights and remedies as to contract projects, "Subcontractors and their employees shall be deemed to be employees of the principal contractor". N.R.S. 616.085. And in the avoidance of technical controversies, " 'Subcontractors' shall include independent contractors". N.R.S. 616.115.

■ On the face of these provisions, we can see no room for dispute that in his performance of the rewelding work Alaperet had to be deemed an employee of Phelps, or in compensation parlance he had the status on the project for rights and liability purposes of a "statutory employee". The contentions made by appellants in an attempt to escape this result are artificial and without substance.

Thus it is argued that Phelps was not in the business of making repair of welding fractures; that General Machine was engaged to do the job for the reason that the operation was one which was not within Phelps' regular "trade, business, profession or occupation"; and that what Alaperet did therefore was of such casual and collateral incidence as to lack the direct relationship to performance of the construction contract necessary to make him a statutory employee.

This, however, ignores the fact that proper welding of the casing sections was part of the work called for and necessary to be done to fulfill the construction contract. If any rewelding had to be done, this would be as much and direct a part of the construction work as the initial welding undertakings. Phelps could only turn over a well whose casing sections were properly joined with "continuous welds". He so recognized in seeking to have the fracture repaired.

■ It is further argued that Alaperet should be regarded as a mere casual employee of Phelps within the definition of that term in N.R.S. 616.030 as constituting "employments where the work contemplated is to be completed in not exceeding 10 working days, without regard to the number of men employed, and where the total labor cost of such

work is less than $100". It would not comport with the object of the Act, in its assimilation of the status of employees of a subcontractor or independent contractor into the status of statutory employees of the general contractor, that any other test should exist as to their status on a construction project than their employment relationship to their regular employer.

But there is no need for us to consider that question further. Under N.R.S. 616.060, Alaperet's status as an employee, whether of General Machine or of Phelps, would not be outside the operation of the compensation law as to such employer, unless what he was doing was "both casual and not in the course of the trade, business, profession or occupation of his employer". As we have indicated, it was part of Phelps' obligation to have the fracture or separation corrected, and the rewelding work therefore, no matter by whom done, necessarily would be work done in the course of Phelps' business of completing his project obligation.

Affirmed.